UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Case Number 05-80617
        Honorable David M. Lawson

ISRAEL CORRAL,

        Defendant.
_____/

### ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE

Defendant Israel Corral has filed a motion asking the Court to reduce his sentence to time served under the authority of the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239. Corral has served all but about ten months of a 120-month prison sentence imposed by the Honorable Avern Cohn for drug trafficking and related crimes. He argues that a sentence reduction is justified because he is immunocompromised and thus at higher risk of contracting a serious case of COVID-19, despite his vaccination status. He also believes that he has demonstrated that the 18 U.S.C. § 3553(a) factors weigh in favor of compassionate release. The government has not addressed the merits of Corral's motion, arguing instead that Corral did not exhaust properly his administrative remedies before seeking relief from this Court. The Court disagrees, because Corral submitted his request to the warden of his institution more than thirty days ago and has received no response. And Corral's case fits within the narrow exception that the Sixth Circuit established in its holding in *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021), which generally bars prisoners from arguing that the pandemic presents an extraordinary and compelling reason for a sentence reduction. Finally, the factors in 18 U.S.C. § 3553(a) favor early release. The Court will grant the motion.

I.

Corral was charged with and pleaded guilty to crimes related to his involvement with a large marijuana trafficking conspiracy from approximately 1994 to 2005. According to the government, he was responsible for obtaining quantities of marijuana from suppliers in Arizona and coordinating shipments of marijuana to Detroit. He also allegedly helped collect drug proceeds. Resp., ECF No. 789, PageID.4044-45. Although Corral was indicted in 2005, he resided in Mexico and was not arrested until 10 years later, in March 2015. He was detained in Mexico until he was extradited to the United States in June 2016. In August 2017, Corral pleaded guilty to all three charges against him: conspiracy to distribute 1,000 or more kilograms of marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A); conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (h); and use of a telephone to facilitate a drug conspiracy, in violation of 18 U.S.C. § 843(b). At his plea hearing, he accepted responsibility for more than 1,000 kilograms of marijuana. Plea Tr., ECF No. 732, PageID.3781-82.

Although Corral entered a guilty plea, he consistently has disputed the extent of his role in the drug trafficking conspiracy. He acknowledged that he became involved with marijuana traffickers from 2004 to 2005, helping on a few occasions to connect buyers and sellers. However, he insists that he never bought or sold narcotics, transported them, or did anything other than broker a few deals, for which he received around $70,000. He also points out that, during the relevant period, he maintained a frugal lifestyle restoring old cars in Sonora, Mexico and engaged in no other crimes. *See, e.g.*, Corral Sentencing Memo, ECF No. 746, PageID.3887.

The government, in contrast, maintains that Corral was a leader in the drug trafficking organization. It first discovered the conspiracy when police officers searched a hotel room in Novi,

Michigan, where it found $3.4 million in U.S. currency and a "pay and owe" sheet listing money owed to, among others, a man referred to as "Chaps." The government insisted that Corral is "Chaps." As evidence, it points to intercepted phone calls between cartel members who made references to "Chapo" or "Shorty," but never, apparently, to "Corral." The government asserted that one of its agents could testify to the fact that he is familiar with Corral's voice and heard it on some of the intercepted calls. The government also pointed to (but did not furnish) the testimony that one of Corral's co-defendants, Edward Walker, reportedly gave to a federal grand jury, in which he identified a photo of Corral as "Shorty." Finally, it presented an affidavit of another one of Corral's co-defendants, Walter Arlequin-Sanchez, signed in 2015. Arlequin-Sanchez attested in the affidavit that he worked for Corral, or "Chapo," to transport drug proceeds in 2004 and 2005, in quantities exceeding $1 million. *See* Gov't Sentencing Memo, ECF No. 739, PageID.3824-41; Sentencing Tr., ECF No. 776, PageID.3987-91. Corral maintained that the government never produced either the intercepted call of Corral's voice or the picture Walker identified as Corral, and has not produced Walker or Arlequin-Sanchez for cross-examination. He avers that he — an impoverished auto mechanic in Mexico — is not the "Chapo" or "Shorty" that the government was looking for, and that it is illogical to suggest otherwise. *See* Corral Sentencing Memo, ECF No. 746, PageID.3888-91.

The parties' starkly contrasting historical accounts resulted in vastly differing guideline range calculations. The government contended that Corral was responsible for conspiring to distribute more than 10,000 kilograms of marijuana, resulting in a base offense level of 34, which it said should be adjusted upward four base levels based on Corral's leadership role and down three levels because he accepted responsibility. That resulted in a total offense level of 35. In contrast, Corral maintained that there was no way he could be responsible for any more than 8,100

kilograms, resulting a base offense level of 32. Corral asked the Court to reduce his base offense level for his minor role in the conspiracy and for accepting responsibility, for a total offense level as low as 25. Corral also argued that the safety valve was applicable because he had no prior drug offenses, was not a leader of the conspiracy, and was not involved in harm to any other person. Gov't Sentencing Memo, ECF No. 739, PageID.3841-45; Corral Sentencing Memo, ECF No. 746, PageID.3892-95.

At sentencing, Judge Cohn accepted the government's view for the purposes of sentencing without making any specific findings as to Corral's role in the conspiracy or going through his objections to the presentence report. Sentencing Tr., ECF No. 776, PageID.3998. By accepting the government's position, Judge Cohn necessarily determined that Corral was not entitled to application of the safety valve because of his role in the offense. *See* U.S.S.G. § 5C1.2(a)(4). Judge Cohn also did not make any specific findings under 18 U.S.C. § 3553(a), although he affirmatively responded to government's counsel's question whether those factors were considered. Sentencing Tr., ECF No. 776, PageID.3999. Judge Cohn sentenced Corral to 120 months in prison, the mandatory minimum term for the drug conspiracy count, with concurrent terms on the other counts. *Ibid.*

Because he lacks legal status in United States, Corral is not eligible for home detention or placement in a halfway house. He will be deported upon his release from prison. Corral has a projected release date of September 23, 2023. *See* Supp. CR Brief, ECF No. 791, PageID.4059.

Corral presently is serving his sentence at FCI Manchester in Kentucky, which houses 1,026 inmates. As of December 6, 2022, one inmate and one staff member were infected with COVID-19, no inmates had died from COVID-19, and 446 inmates had been infected and recovered from the virus. Additionally, 1,059 inmates and 123 staff members have been fully

vaccinated. *See* https://www.bop.gov/coronavirus/. That includes Corral, who has received three doses of the Moderna COVID-19 vaccine. Med. Recs., ECF No. 792-1, PageID.4176; ECF No. 792-2, PageID.4425.

Corral is 54 years old. He has several autoimmune disorders, including psoriatic arthritis, Med. Recs., ECF No. 792-1, PageID.4104, a "progressive inflammatory condition" that occurs "when the immune system, for unknown reasons, becomes overactive and creates inflammation, leading to pain and swelling," Nat'l Inst. of Arthritis and Musculoskeletal and Skin Diseases, *Psoriatic Arthritis* (accessed Dec. 5, 2022), https://perma.cc/JUK3-BBJC. Although Corral was diagnosed with psoriatic arthritis only recently, he has exhibited symptoms for several years, including uveitis, an "inflammation of the middle layer of the eye" that "must be treated promptly to avoid vision loss." *Ibid*. Corral received "[e]xtremely delayed" treatment after being diagnosed in prison with anterior uveitis in 2020. Med. Recs., ECF No. 792-1, PageID.4135.

In February 2022, Corral also was diagnosed with ankylosing spondylitis, "a type of arthritis that causes inflammation in the joints and ligaments of the spine" and in "severe cases, . . . may cause the vertebrae (bones in the spine) to fuse." Nat'l Inst. of Arthritis and Musculoskeletal and Skin Diseases, *Ankylosing Spondylitis* (accessed Dec. 5, 2022), https://www.niams.nih.gov/health-topics/ankylosing-spondylitis; *see also* Med. Recs., ECF No. 792-1, PageID.4124. Again, Corral appears not to have received timely treatment for this condition. His medical records indicate that health care providers requested three times that Corral be sent to rheumatology for an ankylosing spondylitis evaluation before Corral received a rheumatology consultation. *Id.* at PageID.4124, 4135. In addition to his autoimmune disorders, Corral tested positive for Lyme Disease in January 2022 and latent tuberculosis in March 2021. *Id.* at PageID.4126; Med. Recs., ECF No. 792-2, PageID.4541.

Corral takes immunosuppressants to treat his autoimmune disorders. As of June 2022, he used timolol maleate eye drops and was preparing to start taking Humira. Med. Recs., ECF No. 792-1, PageID.4177. He previously took Xeljanz and methotrexate and received ondansetron injections, but he had to discontinue all three medications because he had negative reactions, some of which were severe. *See* Med. Recs., ECF No. 792-1, PageID.4089-97. He began treatment for Lyme Disease upon diagnosis and recently consented to latent tuberculosis treatment in the hopes that such treatment will allow him to better tolerate the arthritis drug Humira. Med. Recs., PageID.4101, 4126, 4174; Med. Recs., ECF No. 792-2, PageID.4395, 4541; Email, ECF No. 791-4, PageID.4079; Email, ECF No. 791-5, PageID.4080; Med. Recs., ECF No. 792-1, PageID.4101. However, Corral's medical records also suggest that the prison's Health Service has had difficulty ordering Humira on Corral's behalf. *See id.* at PageID.4102 (indicating that a nurse had tried to fax in an order nine times without any response).

Corral contends that he is a changed man who reformed himself a long time ago and, at 54, is unlikely to be a threat to anyone if released from prison. He has received zero disciplinary infractions while incarcerated and is considered by the BOP to have a minimum risk of recidivating. Discipline Data, ECF No. 791-7, PageID.4082; Inmate History, ECF No. 791-9, PageID.4084. He holds a job in FCI Manchester's recreation department, *ibid.*, and has taken several job and life skills courses, even though he is not eligible for good time credit under the First Step Act, Transcript, ECF No. 791-9, PageID.4083.

If released, Corral intends to reside with his son in Mexico, where he will obtain medical insurance and treatment for his psoriatic arthritis and maintain employment repairing cars.

Citing the risks posed by the COVID-19 pandemic, his age, and "medical issues," Corral sent a request for compassionate release to his unit manager at FCI Manchester on February 11,

2022. Staff Request, ECF No. 785, PageID.4031. The request indicates that the warden had directed him to submit the request that way. *Ibid.* Corral attests that he never received a response, and the record contains no evidence to the contrary.

On June 17, 2022, Corral filed a *pro se* motion for compassionate release. The Court ordered the government to respond to the motion and appointed Corral counsel to represent him for the purpose of seeking a sentence reduction. The government filed a response brief in opposition to Corral's motion, and Corral's newly-appointed counsel filed a supplemental brief in support of compassionate release in lieu of a reply.

II.

By now it is well understood that, generally, "a federal court 'may not modify a term of imprisonment once it has been imposed,'" *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)), and that this "rule comes with a few exceptions, one of which permits compassionate release," *ibid.* The request for such relief must be presented by a motion filed in federal court, either by the Director of the Bureau of Prisons, 18 U.S.C. § 3582(c)(1)(A), "[o]r it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier,'" *ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). Corral relies on subparagraph (i) of the statute. Under that provision, the

Court can order a reduction of a sentence, even to time served, by following a procedure that the court of appeals has distilled into three steps. *First*, consider whether "extraordinary and compelling reasons warrant such a reduction." *Second*, determine if the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Third*, "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." *United States v. Ruffin*, 978 F.3d 1000, 1004-06 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)).

The Sentencing Commission's policy statement to be considered under step two is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317 (6th Cir. 2019) (*en banc*) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it"). That has led the court of appeals in its evolving guidance on the subject to hold that district courts should dispense with step two when the motion for compassionate release comes from a prisoner and not the BOP. *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020) ("We now join the majority of district courts and the Second Circuit in holding that the passage of the First Step Act rendered § 1B1.13 'inapplicable' to cases where an imprisoned person files a motion for compassionate release.") (citing *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020)).

Last year, the court of appeals took the explanation a step further. In *United States v. Elias*, 984 F.3d 516 (6th Cir. 2021), the court ascribed Congress's amendment of section 3582(c)(1) to the BOP's "rare[]" exercise of its power to move for sentence reductions, that "the program was plagued by mismanagement," and that "the BOP 'ha[d] no timeliness standards for reviewing . . . requests.'" 984 F.3d at 518 (quoting *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020)). It reaffirmed *Jones*'s holding "that § 1B1.13 is not an applicable policy statement for

- 8 -

compassionate-release motions brought directly by inmates, and so district courts need not consider it when ruling on those motions." *Id.* at 519-20. It then held that "in the absence of an applicable policy statement for inmate-filed compassionate-release motions, district courts have discretion to define 'extraordinary and compelling' on their own initiative." *Ibid.* However, the defendant still must satisfy the other two requirements, and his "failure to meet any one of those criteria" will result in the denial of his motion. *United States v. Tomes*, 990 F.3d 500, 502 (6th Cir. 2021).

A.

The parties dispute whether Corral properly exhausted his administrative remedies. Corral provided evidence that he submitted his request to his unit manager at the direction of his warden and waited the obligatory 30 days before he filed his motion in this Court. The government contends otherwise; but it has provided no evidence to rebut Corral's showing or explained with any particularity why it believes that Corral failed properly to exhaust his administrative remedies. The cases cited in its response, however, suggest that the government believes that Corral moved for compassionate release on different grounds than he raised during the administrative process.

That argument cannot carry the day for a couple of reasons. For one, this Court has found that "issue exhaustion" is not required by section 3582(c)(1)(A)(i), because it would be particularly "inappropriate under the circumstances" of the pandemic to impose "any further exhaustion requirement . . . not mandated in any plain terms of the statute." *United States v. Williams*, 473 F. Supp. 3d 772, 775 (E.D. Mich. 2020). Instead, courts must look to whether "the statutory ground for the request has . . . changed from when it first was submitted" — that is, whether the defendant based both his administrative request and motion on "'extraordinary and compelling circumstances' under the authority of 18 U.S.C. § 3582(c)(1)(A)(i)." *Ibid.*

Second, Corral's request to the warden tracks very closely to the arguments he sets out in the present motion, which makes the government's apparent reliance on issue exhaustion puzzling. Corral plainly sought from the warden a sentence reduction based on "medical issues" that put him "at a high risk for Covid." Staff Request, ECF No. 785, PageID.4031. He later moved for compassionate release on the same basis. Mot., ECF No. 785, PageID.4018-20. Corral included more details about his medical issues in his motion, but he will not be penalized for that additional specificity. The BOP already had "before it all of the pertinent information about both the defendant and the circumstances that pose risks to his health" when Corral applied to the warden and his unit manager for compassionate release. *See Williams*, 473 F. Supp. 3d at 776.

The government has not explained how Corral's request fell short of the requirements set out in section 3582(c)(1)(A). The record, however, demonstrates that Corral sufficiently presented his request for release to prison authorities and waited more than 30 days for a favorable response. That is sufficient to satisfy the exhaustion requirement under the circumstances of this case.

B.

Addressing the first element — extraordinary and compelling reasons — Corral argues that he suffers from a heightened risk of developing severe complications from COVID-19 because he suffers from multiple autoimmune disorders, for which he takes immunosuppressants. He also notes that he suffers from latent tuberculosis and Lyme disease. The government has not addressed this argument.

The Sixth Circuit has narrowed significantly the circumstances in which the COVID-19 pandemic can provide extraordinary and compelling reasons for compassionate release. In light of the wide availability of COVID-19 vaccinations, the court of appeals has held that "a defendant's incarceration during the COVID-19 pandemic — when the defendant has access to

the COVID-19 vaccine — does not present an 'extraordinary and compelling reason' warranting a sentence reduction." *United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021) (citing *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021)). However, it also has acknowledged a narrow exception to this rule: Defendants "may still be able to show 'extraordinary and compelling reasons' warranting a sentence reduction" if they present "extenuating circumstances," *United States v. McKinnie*, 24 F.4th 583, 588 (6th Cir. 2022), or demonstrate that they are "unable to receive or benefit from a vaccine," *Lemons*, 15 F.4th at 751.

Corral's case easily fits within that narrow exception. There is no question that Corral is immunocompromised, whether due "to immune dysregulation" caused by his psoriatic arthritis or due to the immunosuppressive drugs administered to control his autoimmune disorders. Yaşar Keskin et al., *What Has Changed in the Treatment of Psoriatic Arthritis After COVID-19?*, 53(2) Eurasian J. Med. 132, 133-34 (2021), https://perma.cc/F99K-KDPU. Corral therefore may be at a higher risk of contracting COVID-19 even though he is fully vaccinated. The Centers for Disease Control and Prevention warn that moderately or severely immunocompromised individuals are at "increased risk of severe COVID-19 illness and death" and may not have "as strong" of a response to COVID-19 vaccination. *COVID-19 Vaccines for Moderately to Severely Immunocompromised People*, Ctrs. for Disease Control & Prevention (Dec. 5, 2022), https://perma.cc/8XN2-KN9R. That is particularly true for people like Corral who take medications like Humira and methotrexate that suppress their immune response. *See* Nat'l Psoriasis Found., *COVID-19 Task Force Guidance Statements* 4.10 (Apr., 28, 2022), https://perma.cc/Y8ZM-BTZW ("Patients with psoriasis and or psoriatic arthritis who are taking certain medications that affect the immune system in a manner that may increase the risk of infections may not be fully protected even if fully vaccinated against COVID-19."). Although limited, preliminary research suggests that Humira — a TNF inhibitor

- 11 -

— may generate "less powerful and shorter-lived antibodies against the virus that causes COVID-19." Tamara Bhandari, *COVID-19 Vaccine Elicits Weak Antibody Response in People Taking Immunosuppressant*, Wash. Univ. Sch. of Med. (Nov. 19, 2021), https://perma.cc/P6DQ-TGWK. Methotrexate also may reduce antibody-mediated immunity to COVID-19. Savteer K. Mahil et al., *The Effect of Methotrexate and Targeted Immunosuppression on Humoral And Cellular Immune Responses to the COVID-19 Vaccine BNT162b2: A Cohort Study*, 3(9) Lancet 627, 631, 635 (2021), https://perma.cc/6KH4-KXLT.

Complicating Corral's case is the fact that he only recently was diagnosed with autoimmune disorders. And he received his third COVID-19 vaccine dose in January 2022, a month before he began taking methotrexate, one of the immunosuppressant oral medications that may reduce the vaccine's efficacy. Med. Recs., ECF No. 792-1, PageID.4091, 4101-04, 4176; Med. Recs., ECF No. 792-2, PageID.4425. Guidance for psoriatic arthritis patients suggests that the COVID-19 vaccine may be more efficacious if methotrexate is paused prior to vaccination. *See* Nat'l Psoriasis Found., at 4.12 ("Patients who are taking methotrexate with well-controlled psoriatic disease, may . . . consider holding it for 2 weeks after receiving a booster vaccine in order to potentially improve vaccine response."). However, there is substantial evidence in the record to suggest that Corral's autoimmune disorders are poorly controlled and that he has encountered lengthy delays in receiving critical care. He waited at least a year and half for uveitis treatment due to "extremely delayed" follow-up, despite the risk of vision loss and exhibiting "multiple negative prognostic indicators." Med. Recs., ECF No. 792-1, PageID.4135. He waited for a rheumatology consultation regarding treatment for his ankylosing spondylitis, despite Health Services requesting such a consult at least three times before January 2022. *Ibid.* He was not diagnosed with or treated for psoriatic arthritis until June 30, 2022, despite exhibiting symptoms

two years earlier during the summer of 2020. *Id.* at PageID.4104, 4135. And it appears that he may still be experiencing delays in receiving certain psoriatic arthritis treatments: a nurse reported faxing in a Humira prescription for Corral nine times in June and July 2022 before receiving a response. *Id.* at PageID.4102. Inadequate treatment may increase Corral's risk of related conditions that, again, may increase the corresponding risk that Corral will incur a severe course of COVID-19 despite his vaccination status. *See* Keskin et al. at 133-34.

Courts in this circuit have granted compassionate release to fully-vaccinated prisoners exhibiting similar medical conditions, recognizing *Lemons*'s "rare" exception. *See United States v. Nagi*, No. 06-20465, 2021 WL 5114579, at *3 (E.D. Mich. Nov. 3, 2021) (finding longtime use of corticosteroids an extraordinary and compelling reason for a sentence reduction post-*Lemons*); *United States v. Brown*, No. 13-20350, 2021 WL 3810766, at *2 (E.D. Mich. Aug. 26, 2021) (finding malignant prostate cancer and chronic kidney disease extraordinary and compelling reasons for a sentence reduction pre-*Lemons*); *United States v. Barrett*, No. 11-173, 2022 WL 2964883, at *3 (S.D. Ohio July 26, 2022) (finding diabetes, hypertension, chronic kidney disease, and bowel issues extraordinary and compelling reasons for a sentence reduction, regardless of COVID-19); *see also Jones v. United States*, No. 17-20608, 2021 WL 4264763, at *1 (E.D. Mich. Sept. 20, 2021) (finding prisoner with a "litany of medical problems" present extraordinary and compelling reason for a sentence reduction where there was no evidence he was offered a COVID-19 vaccine). In granting this relief, courts weighed the latent risk of severe disease to immunocompromised prisoners, including the incidence of community spread caused by unvaccinated prisoners and staff. Here, Corral reports that "many correctional officers and other staff working at his facility have not been vaccinated and that his facility has stopped surveillance testing." Supp. Brief, ECF No. 791, PageID.4067. BOP data indicate that staff members and

inmates at FCI Manchester presently are testing positive for COVID-19. *See* https://www.bop.gov/coronavirus/. Moreover, FCI Manchester until recently remained at a Level 3 operational level, indicating a high community transition or medical isolation rate or a low facility vaccination rate. Ongoing transmission makes Corral, with his weakened immune system and declining health, vulnerable to contracting COVID-19 and suffering severe side effects.

Corral has demonstrated that he may not be able to benefit from the COVID-19 vaccine, putting him at a high risk of suffering severe complications if he contracts the coronavirus. He has established that his medical conditions, even under *Lemons*, are extraordinary and compelling reasons for compassionate release.

C.

Although the defendant has made a satisfactory showing of extraordinary and compelling medical risk, the Court must also consider the relevant factors listed in 18 U.S.C. § 3553(a). Again, the government has not addressed this argument.

There is no requirement that the prisoner must establish a lack of dangerousness, as is the case for compassionate release applications made by the BOP. *See* U.S.S.G. § 1B1.13; *Jones*, 980 F.3d at 1109 ("Until the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion."); *Elias*, 984 F.3d at 519-20 (same).

That is not to say that dangerousness is irrelevant. It is a factor incorporated in section 3553(a), which must be "consider[ed]" before release for extraordinary and compelling reasons may be allowed. *See* 18 U.S.C. § 3553(a)(2)(C) (requiring a sentencing court to consider "the need . . . to protect the public from further crimes of the defendant"). And any sentence reduction

also must account for "the seriousness of the offense," the need "to promote respect for the law," and concerns about "afford[ing] adequate deterrence to criminal conduct." *Id.* § (2)(A), (C). These factors are to be considered together with the prisoner's circumstances to arrive at a conclusion that they are sufficiently compelling to justify a sentence reduction.

The court of appeals has held that the Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed "to remain [] an accurate assessment as to whether those factors justify a sentence reduction." *United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021). Although Judge Cohn stated at sentencing, when prompted by the government, that he imposed Corral's sentence "pursuant to the factors found at 18 U.S.C. 3553(a)," he did not explain on the record how he evaluated those factors. Sentencing Tr., ECF No. 776, PageID.3999. And he sentenced Corral to the mandatory minimum term required for the offense of conviction. The sentence, therefore, more likely is based on the statutory requirement than any detailed consideration of the section 3553(a) factors. Nevertheless, Corral must "make a compelling case as to why the sentencing court's § 3553(a) analysis would be different if conducted today." *Sherwood*, 986 F.3d at 954.

Foremost among those factors, of course, is the applicable sentencing guideline range. 18 U.S.C. § 3553(a)(4)(A). Although the parties offered conflicting facts at the sentencing hearing, and the two versions would have yielded different sentencing guideline calculations, for the purpose of this motion, the Court considers the sentencing guideline range that the Probation Department calculated for Judge Cohn. Assuming that Corral was a leader of the drug trafficking conspiracy, the probation department calculated that range for all counts of conviction at 168 to 210 months, with the mandatory ten-year minimum on the drug conspiracy count. Judge Cohn sentenced Corral below that range to the 10-year mandatory-minimum. He did not make any

findings regarding Corral's role, despite Corral arguing at sentencing that he was eligible for the safety valve and that the probation's department guideline range was too high.

The sentence must "promote respect for the law," 18 U.S.C. § 3553(a)(2)(A); a sentence that is too harsh undermines that goal as much as a sentence that is too lenient. In weighing whether Corral's sentence was unduly harsh, the Court would have benefited from additional factual development at sentencing regarding Corral's role in the drug trafficking conspiracy — particularly with the government's admission that Corral's sentence would come down to "the issue [of] whether we have the right 'Chapo.'" Sentencing Tr., ECF No. 776, PageID.3983. That issue remained unresolved. *Id.* at PageID.3998. Regardless of what the facts would have shown, however, Corral has served more than 86% of his sentence and is scheduled to be released from custody in less than a year. If not for his immigration status, he presently would be eligible for release to a halfway house. The "amount of time" that Corral has served on his sentence therefore does not weigh against a finding that Corral received "'just punishment'" given the seriousness of his offense. *United States v. Ruffin*, 978 F.3d 1000, 1008 (6th Cir. 2020) (quoting 18 U.S.C. § 3553(a)(2)(A)).

It is well accepted that "evidence of postsentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011) (quoting 18 U.S.C. § 3553(a)(1)). Corral's efforts at rehabilitation are recounted above; they evidence a changed man who poses little risk to the public. Corral is 54 years old and a citizen of Mexico. His present convictions likely will result in his removal from the country, which he never entered illegally, having been extradited to the United States in 2016 for the prosecution of this case. He has been in Bureau of Prison custody since March 18, 2015, and his disciplinary record is excellent. He regularly was employed in the prison and currently holds a job in the

recreational department. He has received no disciplinary reports. And the BOP has determined that Corral falls in the Low Risk of Recidivism Level. That assessment corresponds with empirical evidence from the United States Sentencing Commission, which has recognized that the rate of recidivism overall drops significantly with age.

That leads to consideration of "the need . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Corral's age and the age of this case suggest that the need for specific deterrence virtually is nonexistent. Corral has engaged in no criminal conduct since his indictment nearly 20 years ago; had no criminal record prior to his indictment; and, again, has no disciplinary record to speak of in prison. Adequate deterrence also has been provided to the population at large. Corral not only has served the majority of his sentence, but he also spent 15 months in a Mexican jail under inordinately harsh conditions while awaiting extradition to the United States. There is no risk of an overly-lenient sentence if Corral's request for a sentence reduction in this case is granted. *Cf. United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (one-day sentence too lenient for general deterrence); *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010) (same); *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (suggesting same).

One factor that was not — and could not have been — addressed at sentencing is the need to "provide the defendant . . . with needed medical care." 18 U.S.C. § 3553(a)(2)(D). That factor takes on new meaning in light of Corral's current medical vulnerabilities, and favors relief here when the defendant's continuing health challenges are considered.

The factors outlined in 18 U.S.C. § 3553(a) favor relief in this case.

III.

The unrebutted evidence indicates that Corral has exhausted his administrative remedies. He also has established "extraordinary and compelling" reasons for relief within the meaning of 18 U.S.C. 3582(c)(1)(A)(i). The balance of the other pertinent factors does not preclude his request for relief.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 785) is **GRANTED**.

It is further **ORDERED** that the defendant's term of custody is **REDUCED** to time served.

It is further **ORDERED** that this order is stayed for up to fourteen days to allow the Bureau of Prisons to verify the defendant's residence and release plan, to make appropriate travel arrangements, and to notify the Bureau of Immigration and Customs Enforcement (ICE) of the defendant's potential release status. Unless ICE places a hold on the defendant, the defendant shall be released as soon as a residence is verified, a release plan is established, and appropriate travel arrangements are made. There shall be no delay in ensuring travel arrangements are made. If more than fourteen days are needed to make appropriate travel arrangements and ensure the defendant's safe release, the parties shall immediately notify the Court and show cause why the stay should be extended.

It is further **ORDERED** that if the defendant is not deported, he must provide to the probation office in the district where he will be released the complete address where he will reside upon release. An amended judgment and commitment will enter.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated:   December 6, 2022